UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KENNETH J. BAUWENS, JACK BLOCK, KEVIN CONNOLLY, JOHN P. DALTON, I. STEVEN DIAMOND, DONALD FINN, CHRISTOPHER N. McCORMICK, MARIO MILLER, KEVIN O'SHEA, MICHAEL L. WALSDORF, and I. STEVEN DIAMOND, as the Electrical Insurance Trustees,<br><br>Plaintiffs,<br><br>vs.<br><br>NORTHWEST MECHANICAL CONSTRUCTION, INC., NORTHWEST MECHANICAL & ELECTRICAL CONSTRUCTION, INC., NORTHWEST MECHANICAL & ELECTRICAL, INC., and MELVIN WALLS,<br><br>Defendants. | 15 C 2863<br><br>Judge Gary Feinerman |

## MEMORANDUM OPINION AND ORDER

The trustees of an electrical workers' union benefit fund sued three related corporations—Northwest Mechanical Construction, Inc. ("Northwest I"), Northwest Mechanical & Electrical Construction, Inc. ("Northwest II"), and Northwest Mechanical & Electrical, Inc. ("Northwest III") (collectively, "the Northwest entities")—and their principal, Melvin Walls, under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, alleging failure to pay contributions required under a collective bargaining agreement. Doc. 1. Defendants stipulated to liability, Docs. 100-101, and a bench trial on damages was held, at which the Northwest entities were unrepresented (their attorneys having withdrawn shortly before trial, Doc. 114) and Walls was *pro se*. Docs. 119-120. The parties filed written closing arguments. Docs. 121, 124-125.

Pursuant to Federal Rule of Civil Procedure 52(a), the court enters the following Findings of Fact and Conclusions of Law. To the extent that any Findings of Fact may be considered Conclusions of Law, they shall be deemed Conclusions of Law, and vice versa. After considering the admissible evidence and assessing the witnesses' credibility, the court awards judgment to Plaintiffs in the amount of $228,072.87.

**Findings of Fact**

  **A. Procedural History**

  1. Plaintiffs filed this suit on April 1, 2015. Doc. 1. Defendants were initially represented by attorneys from the Patterson Law Firm. Docs. 8, 12, 26-28.

  2. In July 2015, Plaintiffs served discovery requests on Defendants, including for payroll records, timesheets and other records of hours worked; records of payments to employees; tax and accounting records; and documents related to contracts or subcontracts for electrical work, including "bids, estimates or proposals for such work, and lien waivers." Doc. 32-1.

  3. In September and November 2015, Defendants produced documents in response to the discovery requests, in two tranches totaling just over 1,000 pages. Doc. 121 at 3. Additional relevant documents later came into Defendants' possession, but they did not supplement their production.

  4. In February 2016, the attorneys from the Patterson Law Firm withdrew from their representation of Defendants. Docs. 47-50. In April 2016, substitute counsel appeared for Defendants. Docs. 55-56.

  5. Months later, in a status report and final pretrial order, the parties reported that Defendants had stipulated to liability and that Plaintiffs had waived any claim to contributions

for out-of-jurisdiction work. Docs. 100-101. The parties also reported that the trial would determine only the amount of Plaintiffs' damages. Doc. 101.

6. The trial was postponed to allow more time to complete an audit of Defendants' records, in an attempt to resolve the case without trial. Docs. 102, 105, 107.

7. About two months before the rescheduled trial, substitute counsel withdrew from their representation of Defendants. Docs. 111, 114. From that point forward, including at trial, Walls represented himself *pro se* and the Northwest entities were unrepresented. (As corporations, the Northwest entities could not represent themselves *pro se*, *see Trade Well Int'l v. United Central Bank*, 825 F.3d 854, 860 (7th Cir. 2016), but because Walls could represent himself and is on the hook for any judgment against the entities, he was entitled to defend against all of Plaintiffs' claims.)

### B. The Audit

8. At all relevant times, a collective bargaining agreement ("the Principal Agreement") was in force between the Electrical Contractors' Association of City of Chicago and Local Union No. 134, International Brotherhood of Electrical Workers, covering work performed in Cook County. Pl. Exh. A. Northwest I bound itself to the Principal Agreement by executing a letter of assent on April 25, 2012. Doc. 1-1.

9. Michael Villarreal has been employed by Legacy Professionals LP for nearly two decades and was a manager in its compliance audit department. Tr. 12:17-18. He has performed more than 1,000 payroll audits for unions and their welfare funds. *Id*. at 13:15-17.

10. Villarreal commenced his audit of the Northwest entities in 2016. He met with Defendants' substitute counsel and received a flash drive containing a set of documents called

"project bids." *Id*. at 15:12-16. The "project bids" broke down costs into various categories, including separate entries for "material costs" and "labor costs." *Id*. at 71:22-72:5.

11. Villarreal did not receive from Defendants any tax documents or payroll records, which were the standard documents he would typically rely on to conduct an audit. *Id*. at 15:17-19. Other relevant documents were missing as well. *Id*. at 15:20-16:11.

12. Defendants had no document retention policy, but tried to save records for at least six months. *Id.* at 150:21-23. Walls and his wife, however, sporadically deleted records—or ordered records to be deleted— to save space on their server, sometimes after less than six months had passed. *Id*. at 151:1-21.

13. Prior to 2016, Defendants used Quickbooks, which automatically deletes files within a year when payment is delinquent. *Id*. at 152:17-23.

14. Villarreal followed up with substitute counsel several times to request additional documents. *Id*. at 19:15-21. In May 2016, Villarreal was provided with some Quickbooks payroll records. *Id*. at 19:22-20:2; *see* Pl. Exh. D-1.

15. Among the documents Villarreal received was an Excel spreadsheet that listed all projects that the Northwest entities had worked on, as well as the timeframe (approximate start and end dates) during which each project was active. Pl. Exh. D-2; Tr. 86:22-87:6. Reports from a program called "T Sheets" were not among the documents that Villarreal received. *Cf.* Tr. 116:19-119:25.

16. Villarreal's audit of Northwest I covered the period from April 1, 2013 through December 31, 2014. *Id*. at 16:20-24. His audit of Northwest II covered April 1, 2013 through August 31, 2014. *Id*. at 17:6-9. His audit of Northwest III covered April 1, 2013 through May 16, 2016. *Id*. at 17:10-13.

4

17. Given the dearth of records, Villarreal estimated the Northwest entities' contribution shortfalls by reviewing the bid documents, identifying which were for projects the Northwest entities undertook in Cook County, and estimating the number of covered person-hours worked on each such project. *Id*. at 17:14-22. As he explained:

> A. … So, what I did was went through each and every one of their project bids and verified any type of labor costs and the completion dates, took the labor costs and divided by the current journeyman rate at the completion of the project; and that's how I came up with the hours for most of those bids. And then … we took the wages of those labor costs and applied it to that particular fund.
>
> Q. To the extent you could, you determined what hours were worked, and then you multiplied that by the amounts due for contributions?
>
> A. We divided that by the rate to come up with the hours, yes.

*Id*. at 17:23-18:11.

18. Villarreal excluded any hours that appeared to have been worked by non-covered employees, as well as any hours that appeared to have been worked on non-covered tasks. But where he could not tell whether an employee or hour was covered, he erred on the side of inclusion. *Id*. at 28:7-12.

19. Based on this methodology, Villarreal submitted an audit report concluding that Northwest I owed $37,091.22 in unpaid contributions, Northwest II owed $61,223.82, and Northwest III owed $117,524. Pl. Exh. D.

### C. Disputed Projects

20. One project Northwest III had during the relevant period was at "Dinosaur BBQ" in Chicago, which is within Cook County. *Ibid*. According to Walls's testimony (Walls: "[D]uring that time frame for that project, that … was really the only project that the company worked on—[that] Northwest III worked on—was Dinosaur Barbecue." Tr. 70:12-15), which

5

the court credits in this particular respect, Northwest III had no other projects underway during the time it was working on the Dinosaur BBQ project.

21. But Villarreal testified that, in addition to counting hours listed for the project, he counted hours recorded in some Northwest III employees' personal records—which means that he double-counted some hours during that time. *Id*. at 26:5-28:15.

22. One other project Northwest II had during the relevant period was at Lighthouse Church of All Nations in Alsip, Illinois. Pl. Exh. D-2. The Excel spreadsheet identified $80,000 in "Total Cost for Labor & (15% for Overhead and Profit)" for the project, but noted that the project was only 60% completed. Pl. Exh. D-2.

23. Villarreal ignored the suggestion in the Excel spreadsheet that the Lighthouse project was only partly completed and the possibility that 15% of these funds were allocated to "Overhead and Profit." He accordingly used the entire $80,000 as the estimated labor cost in his calculations. Tr. 124:10-125:22.

**Conclusions of Law**

Section 515 of ERISA requires employers to abide, "to the extent not inconsistent with law," by collective bargaining agreements that oblige them to "make contributions to a multiemployer plan." 29 U.S.C. § 1145. When an employer fails to make required contributions, § 502(g)(2) of ERISA empowers a court to award, among other relief, the amount of the unpaid contributions, interest, and liquidated damages up to 20% of the unpaid amount, if the plan provides for liquidated damages. 29 U.S.C. § 1132(g)(2); *see Laborers' Pension Fund v. RES Envt'l Servs., Inc.*, 377 F.3d 735, 739 (7th Cir. 2004). Here, the Principal Agreement provided for liquidated damages of 20%. Pl. Exh. A, § 17.01(c)-(d).

ERISA requires employers to maintain records for their employees "sufficient to determine the benefits due or which may become due to such employees." 29 U.S.C. § 1059(a)(1); *see also* 29 U.S.C. § 1027 (requiring retention of such records for at least six years). "The records must be contemporaneous time records that reflect the type of work performed, the date the work was performed, and the work location." *Sullivan v. Tag Plumbing Co.*, 2012 WL 3835526, at *5 (N.D. Ill. Sept. 4, 2012) (internal quotation marks omitted); *see also RES Envt'l Servs.*, 377 F.3d at 739.

If a fund "shows that an employer's records are deficient and produces an apparently sound accounting suggesting that money is owed," it becomes the employer's burden to "explain why its payments to the funds are nevertheless proper." *Chicago Dist. Council of Carpenters Pension Fund v. Reinke Insulation Co.*, 347 F.3d 262, 264 (7th Cir. 2003); *see also RES Envt'l Servs.*, 377 F.3d at 739 (same); *Laborers' Pension Fund v. A & C Envt'l, Inc.*, 301 F.3d 768, 783 (7th Cir. 2002) (explaining that this burden-shifting approach protects funds from being "unable to prove damages with specificity because of the employer's failure to keep adequate records"). Once the employer, in disagreeing with the fund's audit, offers a colorable explanation for its position, there is a triable issue on whether the employer in fact owes the disputed contributions. *See RES Envt'l Servs.*, 377 F.3d at 739; *Reinke Insulation*, 347 F.3d at 264; *A & C Envt'l*, 301 F.3d at 783; *Ill. Conf. of Teamsters and Emp'rs Welfare Fund v. Steve Gilbert Trucking*, 71 F.3d 1361, 1367 (7th Cir. 1995). At trial, the fund must prove that the auditor's conclusions are reasonable; although Plaintiffs suggest otherwise, Doc. 121 at 2-3, there is no "evidentiary presumption" at trial that the defendant bears the burden of overcoming. *See Reinke Insulation*, 347 F.3d at 264 ("If the [employer's] explanation appears to be sufficient, then the fund must demonstrate at trial its entitlement to additional payment."). So where Walls offered a credible

7

explanation why certain hours were not covered and supported that explanation with credible evidence at trial, the court will reduce the auditor's figures accordingly. *See id*. at 265 ("This case was tried: the employer produced an explanation and backed it up with evidence that the district judge believed. The only question that matters is whether the district judge's decision is clearly erroneous.").

In his closing argument, Walls asserted that he, Northwest II, and Northwest III should not be bound to make any contributions because, unlike Northwest I, they did not sign a letter of assent to the Principal Agreement. Doc. 124 at 4-8. This argument fails, for Walls, Northwest II, and Northwest III waived it when they (acting through their then-counsel) stipulated to liability. Docs. 100-101; *see United States v. Firishchak*, 468 F.3d 1015, 1024 (7th Cir. 2006) ("[Defendant] stipulated to this legal conclusion, so he waived the issue.").

At trial, Walls attempted to cross-examine Villarreal using reports generated by "T Sheets," a timekeeping program that (Walls says) the Northwest entities began using in December 2015. Tr. 115:24-122:6. Villarreal testified that he was generally unfamiliar with the "T Sheets" program, and specifically unfamiliar with the reports Walls showed him. *Ibid.* Walls never moved any of the T Sheets reports into evidence, nor is there any indication he disclosed them during discovery. *Ibid.* The court therefore will not consider the T Sheets reports, and because Villarreal did not have access to them, the court will not call into question Villarreal's conclusions because he did not take them into account.

The court now determines, based on the facts in evidence, the amounts due. In so doing, its jumping off point is Villarreal's audit—which by and large was a reasonable, evidence-based approximation of the amounts owed, and the best that could be done given Defendants' sparse

and substandard recordkeeping. That said, Villarreal's totals require a modest adjustment to account for two instances in which Walls presented persuasive evidence or argument.

First, there is the Dinosaur BBQ project. The court finds credible Walls's evidence that at least some hours for that project must have been double-counted—including 26 hours attributed to Leonel Gonzalez in January 2015. Pl. Exh. D; *see* Tr. 26:12-27:18. So the court will reduce the amount the audit report ascribes to Northwest III by the amounts attributable to Gonzalez: **$404.54** for the Health & Welfare, Local Pension, Apprenticeship and Training, and Supplemental Unemployment Benefit Funds ("H&W Fund"); **$127.92** for the Annuity Plan; **$2.08** for the Administrative Maintenance Fund; and **$13.00** for the SUB Fund. Pl. Exh. D. There may be other employees whose time on the Dinosaur BBQ project was double-counted, but Walls did not point the court to evidence of who else or how much, so there is no basis in the record for further reductions.

Second, there is the Lighthouse Church project. The court, crediting the Excel spreadsheet, concludes that 15% of the "Labor" cost for the Lighthouse Church project was overhead and profit, not spent on person-hours, and that the Lighthouse Church project was only 60% completed by Northwest II. Pl. Exh. D-2. Given this, the court concludes that Northwest II's contributions stemming from that project, as calculated by Villarreal, must be reduced by 15% and then by a further 40% from Villarreal's figures. So $41,490.96 for the H&W Fund (multiplied by 0.85 and then 0.60) becomes $21,160.39, a change of $**20,330.57**; $8,945.79 for the Annuity Plan becomes $4,562.35, a change of **$4,383.44**; $145.46 for the Administrative Maintenance Fund becomes $74.18, a change of **$71.28**; and $909.13 for the SUB Fund becomes $463.65, a change of **$445.48**.

Defendants provided no persuasive or even plausible basis for any further reductions. The court therefore concludes that the Northwest entities owe the funds the following amounts:

Northwest I owes $30,021.53 to the H&W Fund; $6,310.12 to the Annuity Plan; $97.82 to the Administrative Maintenance Fund; and $661.75 to the SUB Fund. The total amount of Northwest I's unpaid contributions is **$37,091.22**. Liquidated damages of 20% adds **$7,418.24**, for a total amount owed of **$44,509.46**.

Northwest II owes $29,119.96 to the H&W Fund ($49,450.53 minus $20,330.57); $6,135.88 to the Annuity Plan ($10,519.32 minus $4383.44); $95.55 to the Administrative Maintenance Fund ($166.83 minus $71.28); and $641.66 to the SUB Fund ($1,087.14 minus $445.48). The total amount of Northwest II's unpaid contributions is **$35,993.05**. Liquidated damages of 20% adds **$7,198.61**, for a total amount owed of **$43,191.66**.

Northwest III owes $89,487.71 to the H&W Fund ($89,892.25 minus $404.54); $24,608.13 to the Annuity Plan ($24,736.05 minus $127.92); $397.32 to the Administrative Maintenance Fund ($399.40 minus $2.08); and $2,483.30 to the SUB Fund ($2,496.30 minus $13.00). The total amount of Northwest III's unpaid contributions is **$116,976.46**. Liquidated damages of 20% adds **$23,395.29**, for a total amount owed of **$140,371.75**.

So the total amount due to Plaintiffs from Defendants is **$228,072.87**.

## Conclusion

For the foregoing reasons, judgment is entered in favor of Plaintiffs and against Defendants in the amount of $228,072.87.

September 15, 2017

_____
United States District Judge